IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **REGINA SHIELDS Individually and as the Personal Representative of the Estate of Samuel Shields** | * | |
| **Plaintiff,** | * | |
| **v.** | | **Case No.: GJH-15-1736** |
| | * | |
| **PRINCE GEORGE'S COUNTY, MARYLAND,** *et al.*, | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Samuel Shields died while detained at the Prince George's County Correctional Facility on June 17, 2014 after being arrested for failing to pay a bus fare. Mr. Shields's spouse, Plaintiff Regina Shields, filed this action, individually and on behalf of Mr. Shields's estate, against Prince George's County, Maryland (PG County) and Correctional Officers Chandler Hines, Andrew Jackson, Erik Wood, Keith Funderburk, Emmanuel Odion, and Armando Rodriguez (collectively, the "Correctional Defendants"); and against Corizon Health Inc. and Nurses Zewdiensh Admassu and Gbemisola Adebayo (collectively, the "Corizon Defendants"). Plaintiff's Third Amended Complaint alleges a variety of state and federal claims, including violations of the Fourteenth Amendment of the United States Constitution; violations of the American with Disabilities Act (ADA) and § 704 of the Rehabilitation Act; negligence; wrongful death pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-901, *et. seq.*; assault and battery; and intentional infliction of emotional distress.

1

After the parties completed Phase I of a bifurcated discovery process, the Defendants moved for summary judgment. ECF Nos. 131 & 139.[1] Specifically, the Corizon Defendants filed a motion for partial summary judgment as to Plaintiff's deliberate indifference claims, ECF No. 131, and the Correctional Defendants moved for summary judgment on all claims brought against them, ECF No. 134. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016).

Plaintiff now concedes that Counts XII, XIII, and XIV fail as a matter of law, and that governmental immunity precludes negligence claims asserted against Defendant PG County. ECF No. 150-1 at 11–12 ¶¶ 1–3. Based on these concessions, the Court will grant the Correctional Defendants' Motion for Summary Judgment as to these Counts and issues. Otherwise, for the following reasons, the Correctional Defendants' Motion for Summary Judgment will be granted in part and denied in part; and the Corizon Defendants' partial Motion for Summary Judgment will be denied.

## I.   BACKGROUND[2]

### A.  Lead up to Mr. Shields's Arrest

Mr. Shields was forty-nine and suffered from several medical conditions, including hypertension, congestive heart failure, atypical chest pain, chronic renal insufficiency, diabetes, asthma, psychosis, and schizophrenia. ECF No. 131-3 at 2.[3] He weighed 347 pounds and was six feet tall. ECF No. 134-23.

As a symptom of his schizophrenia, Mr. Shields would sometimes suffer from what his wife, Plaintiff Regina Shields, described as manic episodes. ECF No. 131-4 at 45:1–3, 61:6–21.

---

[1] The Court bifurcated discovery in two phases: Phase I for the individual defendants, and Phase II, if necessary, for the institutional defendants (i.e., Defendant PG County and Defendant Corizon). The parties have only completed Phase I of discovery. ECF No. 130.

[2] These facts are either undisputed or viewed in the light most favorable to the Plaintiff as the non-moving party.

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system except for exhibits of deposition testimony and video footage.

Around June 13, 2014, Plaintiff noticed that Mr. Shields had begun to exhibit symptoms of another "episode." *Id.* at 59:21, 60:1, 61:4–5. He began calling her "the devil" and acting strangely. *Id.* at 60:2–25, 63:14–21, 64:1–6. They were staying with Plaintiff's daughter at the time, and when her daughter noticed Mr. Shields's strange behavior, she asked that Mr. Shields go to his sister's house for a while to give her a break. *Id.* at 66:13–16. Plaintiff and Mr. Shields ended up sleeping in the hallway of the apartment building. *Id.* at 71:14–21. The next morning, Plaintiff and Mr. Shields started to walk together to McDonald's for breakfast. *Id.* at 73:8–17. Plaintiff thought that Mr. Shields was following her because he would often walk behind her, but when she arrived, she realized Mr. Shields had not followed her. *Id.* For the next several hours, Plaintiff tried to locate her husband. *Id.* at 74:3–17. She continued to look for him for the next few days. *Id.* 74:20–21.

### B. Detention Center Processing and Isolation

On June 17, 2014, Mr. Shields was arrested for failing to pay a bus fare. ECF No. 134-13 at 2. He was pepper sprayed and eventually transported to the Prince George's County Detention Center. *Id.*; ECF. 131-4 at 12–21, 80:1.

He arrived at the detention center around 12:38pm. ECF No. 147-5 at 2. Correctional officers inventoried his personal effects, including multiple prescription drugs. *Id.*; ECF No. 148-10 at 3; ECF No. 148-7 at 19:2–5. The medications that were in Mr. Shields's possession included carvedilol, torsemide, hydralazine, isosorbide, spironolactone, lisinopril, and an inhaler. ECF No. 148-7 at 20:4–6. These medications are for high blood pressure, heart failure, chest pain, and respiratory problems, respectively. *Id.* at 20:9–21:2. The correctional officer who checked in Mr. Shields's personal effects noted that "he had a lot of medication." ECF No. 148-10 at 3. This raised a concern for her that Mr. Shields might have preexisting medical conditions.

*Id.* Based on this concern, she asked Mr. Shields, who was loudly singing in the processing area, whether he had any injuries from his arrest and for his medical history. *Id.* at 2. He "kept singing," rather than answering her questions. *Id.* Other correctional officers at intake also observed Mr. Shields singing to himself and speaking indiscernibly. ECF No. 134-14 at 2; ECF No. 134-15 at 2.

Plaintiff's expert in emergency medical care, Andrew Lawson, M.D., reviewed video of Mr. Shields during this period and noted that Mr. Shields was "talking to himself loudly, and it was hard to understand what he was saying" because it "sounded like gibberish." ECF No. 48-4 at 11:23–12:1. According to Dr. Lawson, Mr. Shields was possibly experiencing "auditory hallucinations"; appeared "withdrawn"; was not making eye contact; and was "distracted by the singing and thoughts, or at least the things he [was] saying to himself." *Id.* at 12:2–6. He appeared, "just by the way he [was] holding himself and the lack of his ability to follow basic commands" to be "mentally ill." *Id.* at 14:20–15:4.

When someone comes into the detention center and is demonstrating symptoms of a mental health issue, correctional offices "do a psych form," contact the mental health providers with the medical unit, and "expedite" the detainee to a "safer environment." ECF No. 145-2 at 37:21–38:3. Sometimes if a detainee is "agitated and combative and unable to stay" in the processing area, he will be brought to the medical unit. ECF No. 145-3 at 137:7–12. The nurses "call the doctor or the psychiatrist" for an order, which allows medical to keep the detainee. ECF No. 145-3 at 137:7–15. Drawing all reasonable inferences in Mr. Shields's favor, no one filled out a mental health form in reference to Mr. Shields. ECF No. 134-10 at 18:4–7.

Shortly after he arrived, correctional officers decided to place Mr. Shields in full restraints because he continued being loud and singing. ECF No. 134-15 at 2; ECF No. 148-10 at

2; ECF No. 147-4 at 49:1–12. Mr. Shields was moved to an isolation cell without incident, ECF No. 134-15 at 2, and he was left in the restraints in isolation for approximately eight hours. ECF No. 147-4 at 46:9–12, 49:1–12. Drawing all reasonable inferences in Plaintiff's favor, during this time, Mr. Shields did not have access to his medications. ECF No. 148-4 at 64:18.

At the time, Alesia Burr was employed as the shift commander responsible for the detention center's processing and reception area. ECF No. 134-10 at 10:13–22, 11:1–13. Around 8:45pm, Burr and another officer removed Mr. Shields's restraints and let him out of the isolation cell, returning him to the processing area. ECF No. 147-5 at 2. For the next hour or so, Mr. Shields moved around various chairs in the processing area, getting up and sitting back down often. *Id.* Burr noticed that Mr. Shields came in with a lot of medication and called the center's medical desk. ECF No. 134-10 at 18:22–19:3. She "read off the medicines" and someone told her "to get him to the medical unit." *Id.* at 19:2–3. Mr. Shields was not combative towards Burr and she observed him to be "a compliant person." ECF No. 145-2 at 43:20, 44:6–7. However, he was not complying with her order to get up from the processing area and get dressed in a detention center uniform. *Id.* 45:12–13. Burr cannot recall whether Mr. Shields said anything in response to her order. *Id.* at 45:14–15. And he did not make any movements towards her. *Id.* at 45:16–18. He appeared agitated and was speaking loudly. ECF No. 147-5 at 2.

### C. Emergency Response Team Incident

At 9:56pm, Burr called the Emergency Response Team (ERT) to help Mr. Shields get dressed in a detention center uniform so that he could be taken to the medical unit. ECF No. 145-2 at 44:16–17, 48:5–8. The ERT team sometimes helps inmates with mental health challenges get changed. *Id.* 48:9–14. As Burr explained, "[e]veryone has to get dressed one way," so sometimes the ERT team observes while "the detainees do it on their own," and other times they

"help them and assist them getting their clothes changed." *Id.* at 45:5–14. Typically, inmates must change into a detention center uniform before they can leave the processing area to go to the medical unit. ECF No. 134-10 at 55:10–14, 57:4–6, 58:15–19. But exceptions are made when appropriate. ECF No. 145-3 at 137:7–15, 138:1–3.[4]

The ERT unit that responded to Burr's signal of a "minor disturbance" consisted of Emanuel Odion, Erik Wood, Andrew Jackson, Keith Funderburk, Chandler Hines, and Armando Rodriguez. ECF No. 134-4 at 26:9–13, 60:13–16; ECF No. 134-5 at 31:22–32:1–5,46:6–13, 50:14–16; ECF No. 134-6 at 37:13–15; ECF No. 134-7 at 13:1–17, 14:9–11, 38:7–14; ECF No. 134-8 at 25:17–20; ECF No. 134-9 at 17:3–7, 17:19–22, 18:2.

Odion was the unit's supervisor and responsible for the team. ECF No. 134-4 at 60:7–10; ECF No. 134-8 at 76:10–19, 80:7–14. Rodriguez outranked Funderburk, Wood, and Jackson. ECF No. 146-2 at 206:13–14. Hines was also a superior officer to Funderburk, Wood, and Jackson. *Id.* at 206:15–17; ECF No. 147-2 at 130:4-131:15.

When the ERT officers arrived in the processing area, Burr told them that personnel from the medical unit had asked that Mr. Shields be expedited to the medical unit. ECF No. 145-2 at 104:14–20. Rodriguez began filming the encounter with Mr. Shields. ECF No. 134-5 at 138: 6–9; ECF No. 134-9 at 66:1–8; ECF No. 145-8.[5] Odion ordered Mr. Shields to get on the floor and place his hands behind his back, but Mr. Shields did not comply and continued to sit in a chair and speak loudly. ECF No. 147-6 at 6. Wood, Funderburk, and Odion then used two pairs of handcuffs (because of Mr. Shields's size) to restrain Mr. Shields, securing his wrists behind his back. *Id.*; ECF No. 145-8 at 00:30. Wood and Funderburk then escorted him to a search room. ECF No. 145-8 at 1:05. Mr. Shields continued to speak in a loud voice and passively resisted the

---

[4] *See also* ECF No. 145-2 at 56:4–8, 16–21, 57:20–22, 58:1–8; ECF No. 147-4 at 117:9–120:10.
[5] ECF No. 145-8 is video footage from the incident and pin cites refer to the video timeline.

officers, not moving along with them. *Id.* Wood and Funderburk therefore used knee strikes to Mr. Shields's peroneal nerve to make him walk. *Id.* at 2:42; ECF No. 147-6 at 6.

Once Mr. Shields was moved into the search room, the video of the encounter no longer shows a clear view of him. ECF No. 145-8 at 2:48. Instead, the video shows a view of what is going on outside the search room. *Id.* Officers inside the search room slapped and struck Mr. Shields and commanded him to lift his arms up and stand up. *Id.* at 3:28, 4:18, 6:40. Mr. Shields yelled things like "blood clot," which is a Jamaican slang showing disgust, *id.* at 4:18; ECF No. 147-6 at 6, "aiyee," ECF No. 145-8 at 8:11, and "murder," *id.* at 11:08. Officers cursed at Mr. Shields, including calling him a "stupid mother fucker" and asking, "what's wrong with your ass." *Id.* at 2:55, 5:21; EF No. 149-3 at 268:18–22. Hines handed Jackson a shoe and the next moment slapping sounds consistent with Mr. Shields being struck by the shoe can be heard in the video. ECF No. 145-8 at 3:18. Odion testified at his deposition that it would not have been permissible for the ERT unit to use shoes as a weapon. ECF No. 145-6 at 149:14–16.

At one point, in response to a command that he stand up, Mr. Shields said that he could not get up because of his knee. ECF No. 145-8 at 6:45; *see also* ECF No. 145-6 at 165:8–167:6. Based on the way Mr. Shields was "talking just real loud, yelling and stuff," Rodriguez "knew something was wrong" with Mr. Shields mentally or emotionally, but "didn't know what it was." ECF No. 145-5 at 70:9–11, 72:4–5. However, Wood, Hines, and Funderburk claim that they either did not know that Mr. Shields suffered from a mental illness, could not make that determination, or could not recall Mr. Shields's demeanor. ECF No. 134-5 at 132:2–5, 132:14–16; ECF No. 134-7 at 107:20–21, 149:22–150:20 ECF No. 134-8 at 92:22–93:1–6. The record does not include evidence about whether Jackson knew that Mr. Shields had a mental illness.

At one point, Hines took out a pepper spray canister and began to shake it, stating "if you do not comply you will be sprayed." ECF No. 147-6 at 7; ECF No. 145-8 at 11:55. However, Odion had talked to a personnel officer and learned that Mr. Shields was asthmatic, ECF No. 145-6 at 168:4–7; he conveyed this information to Hines, and Hines holstered the spray canister. ECF No. 145-8 at 12:55. Shields continued to yell, at times incomprehensibly. *Id.* at 13:04.

Realizing that Mr. Shields may not be understanding the ERT unit's commands, Hines called over Officer Junior Granville, who is of Jamaican descent, to try to communicate with Mr. Shields. *Id.* at 13:25; ECF No. 147-6 at 7.[6] Speaking in the same Jamaican dialect as Mr. Shields, Granville told Mr. Shields to get dressed. ECF No. 134-22. However, Granville told Odion that Shields did not comprehend the command. ECF No. 145-6 at 182:6–7. Shields began to yell "murder" again, ECF No. 145-8 at 14:18, and eventually Granville walked away laughing, *id.* at 15:40. When asked at his deposition about what he does when he determines or believes that a detainee does not understand his orders, Funderburk responded that he would most likely use physical force. ECF No. 149-3 at 156:11–18.

A witness, Latonya Freeman, who had a "good visual of everything" testified at her deposition that after ten or fifteen minutes of back and forth between the officers and Mr. Shields "that's when they started hitting him and kicking him, they literally was hitting them with their fists, kicking them with their feet, or their boots, which were huge, and then they were taking their sticks or whatever was on them and hitting him with it." ECF No. 145-4 at 42:7–12; *see also* ECF No. 145-8 at 16:48–19:52. Wood admitted at his deposition that he did punch Mr. Shields in the dressing room. ECF No. 146-2 at 201:17–21. Funderburk says that he used "brachial stuns" on Mr. Shields.

---

[6] *See also* ECF No. 134-4 at 180:6–181:22; ECF No. 134-8 at 119:14–120:12, 120:18–121:20; ECF No. 134-22.

Freeman noted that from her vantage point, Mr. Shields "wasn't a danger," and "never tried to do anything to anybody" before he entered the dressing room. ECF No. 145-4 at 49:19–21. She saw that "he was just sitting" and "wouldn't get up." *Id.* 49:19–50:1. Once Mr. Shields was in the dressing room, Freeman recalls that "he wasn't fighting back" but he also was not "just laying there," *id.* 72:7–14; instead, he did "squirm" the way a child might if they were trying to get away. *Id.*

In the opinion of Plaintiff's correctional expert, Tim Gravette, "[i]t's not necessary to strike someone to make them change their clothes." ECF No. 147-4 at 30:21–25. As he explained, "if Mr. Shields was fighting with them, lunging at them, all kinds of different things, that's different, but he wasn't doing that." *Id.* According to Gravette, there was no basis for the officers to strike Mr. Shields once he was inside the dressing room "because none of the officers reported that he was striking or attempting to strike them," and their goal was to change his clothes. *Id.* at 103:14–104:5. The "common-sense thing and practical thing" would have been for the ERT unit to "restrain him," "lay him on a bed," and use "safety scissors" to "cut his clothes off him." *Id.* at 29:12–18. Alternatively, it was not necessary for Mr. Shields to be changed into the detention center's uniform before he was seen by medical personnel. *Id.* at 118:5–20. In Gravette's opinion, based on the characteristics displayed by Mr. Shields, officers should have taken him to get evaluated by a mental health professional. *Id.* 119:2–15. Gravette further opined that the ERT officers should have changed their approach "[b]ecause it wasn't working" and they were putting themselves and Mr. Shields at risk of getting hurt. *Id.* at 114:3–6. Even with a disruptive inmate, it makes sense for officers to change their approach within about six minutes of realizing they are not successfully achieving their goal. *Id.* 113:20–25.

In Gravette's opinion, only Funderburk, Jackson, and Wood—"predominantly, Wood and Funderburk"—used unreasonable force. ECF No. 147-4 at 79:23–80:3. Odion never had physical contact with Mr. Shields once he was inside the dressing room and the force used before that was reasonable. ECF No 147-4 at 25:23–25. Hines only had physical contact with Mr. Shields when he used a baton to strike Mr. Shields's arm after Mr. Shields grabbed Odion's leg. *Id.* at 25:13–20, 80:5–9. This force was reasonably deployed. *Id.* Gravette did not consider Mr. Shields's behavior to be "physically aggressive" and concluded that Mr. Shields did not assault anyone. *Id.* at 53:2–20. He explained that although the correctional officers reported that Mr. Shields kicked Jackson and grabbed Odion's leg, "when you got that type of situation going on, sometimes you do get kicked in the shin or something like that. But I didn't deem that as an assault, as an assaultive behavior." *Id.* at 53:11–20.

Freeman estimates members of the ERT unit "were just beating" Mr. Shields as "he was just yelling and screaming" for between five and ten minutes. ECF No. 145-4 at 43:1–4. During this time, Mr. Shields was yelling "murder," ECF No. 145-8 at 17:10, and "no no," *id.* at 17:52, and was moaning, *id.* at 18:21. Then, "all of a sudden," the yelling stopped because Mr. Shields had become unconscious, and correctional officers "pulled [Mr. Shields] out into the hallway" ECF No. 145-4 at 42:20–43:11; ECF No. 145-8 at 19:52. The other women observing the situation from Freeman's position were yelling "You killed him. You killed him." ECF No. 145-4 at 48:16–17. Freeman remembers saying to them "Be quiet before they come kill us." *Id.* at 47:19–20.

### D. Signal 89 - Medical Emergency

Mr. Shields's handcuffs were removed after he became unconscious. ECF No. 134-4 at 254:17–20. Once ERT officers realized that Mr. Shields was unresponsive, they provided

emergency medical assistance, including CPR. ECF No. 134-5 at 168:8–14, 169:18-22, 170:2–8, 171:6–10, 172:2–173: 1–3, 174:2–4, 195:12–14, 208:4–10, 209:13–17, 210:9–13, 214:9–11, 215:2–10, 215:19–22; 216:12–217:1–22. All correctional officers and ERT members are required to be certified in CPR. ECF No. 131-4 at 284:4–9.

Mr. Shields was breathing when ERT officers were providing emergency medical assistance. ECF No. 134-7 at 354:3–9. The ERT officers called a "Signal 89" to indicate a medical emergency two minutes after they began CPR. ECF No. 139-6 at 5; ECF No. 145-8 at 22:20. Two nurses—Nurses Admassu and Adebayo—then arrived at the scene. ECF No. 139-6 at 5; ECF No. 145-8 at 22:23; ECF No. 134-11 at 20: 1–17, 22:7–20, 30:6–8; ECF No. 134-12 at 11:1–6, 23:5–9, 24:11–22, 25:11–18. About thirty seconds later, a correctional officer stated, "call 911." ECF No. 139-6 at 5; ECF No. 145-8 at 22:20:30.

The Nurses were employed by Corizon Inc, a medical contractor, which provides medical and mental health treatment to detainees at the detention center. ECF No. 134-10 at 101:17–22, 102:20–22, 103:1–5. When Nurse Admassu first arrived at the scene, Mr. Shields was laying on the ground, and correctional officers, whom she knew to be trained in CPR, were performing chest compressions. ECF No. 131-7 at 8–19. She then checked his pulse and his breathing. *Id.* at 45:13–22, 46:1–7. However, she failed to check his pulse for the necessary five to ten seconds, only checking for a pulse for three seconds, and failing to position his neck properly to determine a pulse. ECF No. 139-6 at 6. Because of Mr. Shields's size, placing fingers on his neck for three seconds was "not an effective way" to check his pulse. ECF No. 139-5 at 71:9–17. She also did not check his airway or to see if his chest was rising. *Id.* at 72: 2–3. Nurse Admassu also failed to check for a pulse every two minutes. ECF No. 139-6 at 6. As a result, she could not know whether "he was really oxygenating" such that CPR could have been effective. ECF No. 139-5 at

11

71:25–72:5. Nurse Admassu testified at her deposition that after checking Mr. Shields's pulse, she then gave the correctional officers instructions to continue chest compressions and was "observing all over and assisting whatever help they need[ed]." ECF No. 131-7 at 46:2–11.

Nurse Adebayo had never utilized an ambu bag, a medical device used for aeration, prior to this incident but had received specialized training on its proper usage during her nursing training. ECF No. 131-8 at 68:3–20.  Prior to this incident, Nurse Adebayo had never responded to a scene of an individual who was unconscious or not breathing, or of an individual who did not have a pulse. *Id.* at 73:11–22, 74:1–3. Nurse Adebayo substituted the ERT unit's rescue breaths by using the ambu bag for aeration, but after thirty seconds, a correctional officer yelled "pump it" because she was not fully squeezing the bag. ECF No. 139-6 at 5; ECF No. 145-8 at 22:24. She also did not secure the ambu mask to cover Mr. Shields's airway, meaning proper aeration could not have been achieved. ECF No. 139-5 at 70:8–72:15; ECF No. 139-6 at 6. She failed to assess whether Mr. Shields's chest was rising or aerating during breaths, and there were several interruptions in ventilation. ECF No. 139-6 at 6. Nurse Admassu testified that she supervised the use of the ambu bag and believed it was properly used. ECF No. 131-7 at 47:12–16. In the meantime, another nurse went to retrieve an oxygen tank, which was attached to the ambu bag when she returned. ECF No. 139-6 at 5; ECF No. 145-5 at 22:27.

Rodriguez expressed frustrations with the way the nurses handled the medical emergency. ECF No. 139-4 at 98:2–4. He testified at his deposition that he was concerned about "the way they were doing the CPR." *Id.* According to him, "we," meaning the ERT unit, "were doing everything, basically," even though the medical staff "should have taken over." *Id.* at 98:3–6. While the ERT staff "were doing the breathing, the pumps, the 30 pumps," the nurses were "in panic mode." *Id.* at 99:5–8.

After between seven and nine minutes of CPR, a correctional officer suggested using the AED (defibrillator). ECF No. 139-5 at 74:18–19; ECF No. 145-5 at 22:27:03. Nurse Admassu and another nurse took about two minutes to set up the AED, which according to Plaintiff's expert in the nursing standard of care, suggests that "they were uncomfortable with how to use it." ECF No. 139-5 at 76:18–22. The AED pads were placed on Mr. Shields's left breast and upper abdomen even though for someone of Mr. Shields's size this was not the proper placement. *Id.* at 77:7–12. The pads should have been placed to the left of Mr. Shields's nipple and on the midline of his chest so that he could get a shock. *Id.*

Freeman could not see precisely what medical staff were doing because of Mr. Shields's position on the floor, ECF No. 131-9 at 116:19–20, but it appeared to her that the correctional and medical staff were genuinely attempting to resuscitate Mr. Shields, *id.* at 114:15–19, 123:8–11. Consistent with what Freeman witnessed, Plaintiff's expert in the nursing standard explained that while watching the video of the code response she "witnessed an attempt at resuscitation" and "had no reason to doubt it wasn't done properly or any reason to say anything about it." ECF No. 139-12 at 59:15–25, 60:1–2.

Eventually, EMS arrived and took over CPR. ECF No. 139-6 at 5; ECF No. 145-8 at 22:34. Mr. Shields was in the EMS bus 34 minutes after the medical emergency code was called. ECF No. 139-6 at 5. Mr. Shields was transported to a hospital where he was pronounced dead.

### E. Cause of Death

An autopsy was conducted at the Office of the Chief Medical Examiner in Baltimore, Maryland. ECF No. 134-23. Mr. Shields's cause of death was determined to be Non-Ischemic Cardiomyopathy and the manner of death was classified as natural. *Id.*; ECF No. 134-24 at 8:21–

9:8, 31:9–13. The autopsy also determined that schizophrenia and obesity were significant contributing factors. ECF No. 134-23; ECF No. 134-24 at 9:9–17.

Plaintiff's expert in forensic pathology, Mark Flomenbaum, M.D., opines that although Mr. Shields "did have a bad heart" and did suffer from "non-ischemic cardiomyopathy," Mr. Shields "did not die from that alone." ECF No. 148-7 at 46:10–12. Instead, "the extenuating factors of what happened in the detention center is what caused [Mr. Shields's] heart to stop functioning[.]" *Id.* at 14–16. To be sure, Mr. Shields's "heart was significantly pathological" and "he could have had a heart attack almost any time," but he had "been living with that heart" and "what pushed him over the edge was not purely natural disease"; rather, it was "the way he was treated in that center, which made his heart work above and beyond what it was designed to do." *Id.* at 47:25–48:19.

The autopsy documented forty-four discrete injuries that Mr. Shields likely incurred while at the Detention Center. *Id.* at 41:10–42:10. Further, Mr. Shields had not received his medications for high blood pressure, heart failure, or chest pain. ECF No. 148-4 at 64:9–18. Dr. Lawson testified at his deposition that if a person is prescribed medication for hypertension and they go a substantial period without the medicine, that can cause the person's blood pressure to rise. *Id.* at 64:19–24. When the blood pressure rises to a very high level in certain circumstances, it can cause the individual to have a stroke or a heart attack. *Id.* at 64:1–3. When a person who has not received their medication undergoes a strenuous situation, it is even more likely for them to have a stroke or a heart attack. *Id.* 64:4–9. In Dr. Lawson's opinion, the Detention Center's failure to provide Mr. Shields with his hypertension medication, along with the stress and physical trauma he experienced because of his encounter with the ERT unit, caused Mr.

Shields's blood pressure to rise to dangerously high levels and put him at a high risk of heart attack or stroke. *Id.* at 64:1–66:9.

### F. Procedural Background

Plaintiff, Mr. Shields's surviving spouse, filed this suit on June 12, 2015. ECF No. 1. On August 1, 2018, Plaintiff filed her Third Amended Complaint. ECF No. 123. The Third Amended Complaint named Rodriguez as a Defendant for the first time because Plaintiff learned during discovery that Rodriguez was a superior officer to Funderburk, Wood, and Jackson, and could therefore have given them orders. ECF No. 150-1 at 14. However, Rodriguez was never served with the Third Amended Complaint or Summons. *See* Docket, *Shields v. Prince George's County, Maryland et al.*, Case No. 15-cv-01736-GJH.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The burden is on the moving party to demonstrate that there exists no genuine dispute of material fact. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). To defeat the motion, the nonmoving party must submit evidence showing facts sufficient for a fair-minded jury to reasonably return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.     DISCUSSION

### A.  Defendant Armando Rodriguez – Statute of Limitations

The Correctional Defendants argue that the claims against Defendant Rodriguez must be dismissed because he was not named as a Defendant until the Third Amended Complaint, which was filed on August 1, 2018—over a year after the three-year statute of limitations had run on Plaintiff's claims. However, pursuant to Federal Rule of Civil Procedure 15(c)(1), an amendment to a pleading relates back to the date of the original pleading when, among other undisputed requirements,

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1). Defendants argue that Plaintiff has failed to satisfy this requirement because Rodriguez was never formally served with the Third Amended Complaint. ECF No. 158 at 11. However, Defendant Rodriguez received notice of the action within the period provided by Rule 4(m) such that he will not be prejudiced in defending on the merits. Plaintiff's Second Amended Complaint alleged, among other claims, that Odion was responsible for the conduct of Hines, Jackson, Wood, and Funderburk because of his supervisory role. The Second Amended Complaint referenced Rodriguez by name six times, ECF No. 82 ¶¶ 90, 266–70, but it was not until Plaintiff deposed Jackson that she learned that Rodriguez was also a superior officer to Jackson, Wood, and Funderburk. Given that Rodriguez, like Odion, served as a supervisor and was present during the incident, he knew that the action would have been brought against him

16

but for Plaintiff's mistake about his role. Additionally, Defendant Rodriguez is represented by the same counsel as the other Correctional Defendants. *See* Docket, *Shields v. Prince George's County, Maryland et al.*, Case No. 15-cv-01736-GJH. And the Third Amended Complaint did not raise any new claims, meaning counsel was already prepared to defend against Plaintiff's claims on the merits. *Compare* ECF No. 82 *with* ECF No. 123. Because Rule 15(c)(1)(C)'s requirements are satisfied, the addition of Rodriguez to the Third Amended Complaint relates back to the date of the original pleading, which was within the statute of limitations.

### B. Constitutional Claims

Plaintiff alleges that Defendants Wood, Jackson, and Funderburk violated Mr. Shields's constitutional rights by using excessive force against him. Although Plaintiff acknowledges that Defendants Rodriguez, Odion, and Hines either had no physical contact with Mr. Shields or did not use unreasonable force, Plaintiff asserts that these Correctional Defendants are liable for the other officers' conduct because they served in supervisory roles and tacitly authorized the conduct that resulted in Mr. Shields's constitutional injuries. Plaintiff also asserts that the Correctional Defendants and Corizon Defendants violated Mr. Shields's Fourteenth Amendment rights by acting with deliberate indifference in the face of his serious medical needs. The Court now addresses these constitutional claims in turn.

### i. Excessive Force (Defendants Wood, Jackson, and Funderburk)

The Eighth Amendment of the United States Constitution forbids punishment that involves "the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The substantive due process clause of the Fourteenth Amendment prohibits punishment of pretrial detainees based on essentially the same principles as those applied under the Eighth Amendment to post-conviction detainees. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Riley v.*

*Dorton*, 115 F. 3d 1159, 1166–67 (4th Cir. 1997), *abrogated on other grounds*, *Wilkins v. Gaddy*, 559 U.S. 34 (2010).

Courts determine whether force used by prison officials is excessive, in violation of the Constitution, by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). A court must look at "the need for application of force," "the relationship between that need and the amount of force used," "the extent of the injury inflicted," "the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials," and "any efforts made to temper the severity of the response." *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

Here, the record reflects a fundamental disagreement between the parties about whether the force used by Defendants was in good faith or maliciously to cause harm without accomplishing Defendants' stated purpose. *Hudson*, 503 U.S. at 6–7. Although Defendants claim that they applied force only to achieve their goal of changing Mr. Shields's clothes, the record includes evidence that they continued to hit him "with their fists" and "sticks or whatever was on them" and to kick him after it became clear that Mr. Shields might not have understood or been able to comply with their commands. ECF No. 145-4 at 42:7–12; ECF No. 145-6 at 182:6–7; *see also* ECF No. 145-8 at 16:48–19:52. Genuine disputes of material fact thus exist about the need for application of force and the relationship between the need and the amount of force used. As Plaintiff's expert, Tim Gravette, explained, "[i]t's not necessary to strike someone to make them change their clothes." ECF No. 147-4 at 30:21–25. Nor was the approach effective. *Id.* at 114:3–6. Gravette based these conclusions on the fact that the ERT unit could have employed other common-sense tactics. *Id.* at 29:12–18; *id.* at 118:5–20.

Given that officers did not elect to take another approach—such as restraining Mr. Shields and cutting his clothes off with safety scissors or escorting him to medical without changing his clothes—genuine disputes of material fact remain over the efforts made to use force that was reasonable for the situation. To be sure, Odion and Hines at times sought to deescalate the situation; Odion did so when he instructed Hines to holster his pepper spray canister, ECF No. 145-8 at 12:55; and Hines did so when he called Officer Granville in to speak with Mr. Shields in their shared Jamaican dialect, *id.* at 13:25; ECF No. 147-6 at 7. But these facts do not entitle Defendants Wood, Funderburk, and Jackson to summary judgment because there is evidence that they continued "just beating" Mr. Shields as "he was just yelling and screaming" for between five and ten minutes, ECF No. 145-4 at 43:1–4, even after Officer Granville indicated that Mr. Shields could not comprehend their orders, ECF No. 145-6 at 182:6–7. In fact, they never changed their course of action despite its ineffectiveness in getting Mr. Shields to comply; rather, they only stopped using physical force when Mr. Shields became nonresponsive.

As for the extent of the threat to the safety of staff and inmates, Freeman thought Mr. Shields "wasn't a danger," ECF No. 145-4 at 49:19–21, and Gravette opined that there was no basis for officers to even strike Mr. Shields once he was inside the dressing room, ECF No. 147-4 at 103:14–104:5. In fact, according to Gravette, the force applied increased the risk of harm to staff and Mr. Shields. *Id.* at 114:3–6. For example, while Mr. Shields was never combative and did not fight back, he did kick Jackson and grab Odion's leg in response to them engaging him, *id.* at 53:11–20.

Finally, Mr. Shields's injuries were significant. He died. ECF No. 148-7 at 46:10–12; *id* at 46:14–16; *id.* at 47:25–48:19 (Plaintiff's expert Dr. Flomenbaum opining that Mr. Shields died because of the force that officers applied). Further, the autopsy documented forty-four discrete

injuries that Mr. Shields likely incurred while at the Detention Center. *Id.* at 41:10–42:10. The extent of these injuries would likely be serious under any circumstances, but they are especially significant considering the officers' goal was merely to change Mr. Shields's clothes and escort him to the medical unit.

In sum, Defendants Wood, Jackson, and Odion are not entitled to summary judgment on Plaintiff's excessive force claims.

### ii. Supervisory Liability (Defendants Odion, Hines, Rodriguez)

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). To establish supervisory liability, a plaintiff must show "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* at 799.

Here, the record indicates that Odion, Hines, and Rodriguez outranked Wood, Jackson, and Funderburk had a duty to prevent the injuries inflicted by these subordinates. Odion was the unit's supervisor and responsible for the team. ECF No. 134-4 at 60:7–10; ECF No. 134-8 at 76:10–19, 80:7–14. Both Rodriguez and Hines were superior officers to Wood, Funderburk, and Jackson, and their orders would have been followed. ECF No. 146-2 at 206:13–14; *id.* at 206:15–17; ECF No. 147-2 at 130:4-131:15. There is no dispute that each of the potential supervisors had actual knowledge of the rest of the ERT unit's conduct because they were all present

overseeing or filming the scene. Given that genuine disputes of material fact exist about whether Wood, Jackson, and Funderburk's conduct constituted excessive force in violation of the Fourteenth Amendment (*see* § III.B.1 *supra*), disputes precluding summary judgment also exist about whether the observing officers knew the ERT unit's conduct posed an unreasonable risk of constitutional injuries to Mr. Shields.

Although, as previously described, Odion and Hines took some steps to attempt to deescalate the situation, they, at other times, authorized the alleged offensive practices either tacitly or deliberately. For example, Hines handed Jackson a shoe, and drawing all reasonable inferences in Plaintiff's favor, an officer hit Mr. Shields with the shoe. ECF No. 145-8 at 3:18. Neither Odion nor Rodriguez stepped in to stop this conduct even though Odion testified at his deposition that it would not have been permissible for the ERT unit to use a shoe as a weapon under the circumstances. ECF No. 145-6 at 149:14–16. Further, based on the way Mr. Shields was behaving, Rodriguez "knew something was wrong" with him mentally or emotionally, but he never directed his subordinates to take a different approach to changing Mr. Shields's clothes. ECF No. 145-5 at 70:9–11, 72:4–5. The record supports a finding that there was an "'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered" by Mr. Shields because the subordinates were required to comply with their supervisors' orders. ECF No. 134-4 at 60:7–10; ECF No. 134-8 at 76:10–19, 80:7–14; ECF No. 146-2 at 206:13–14, 206:15–17.

Taken together, Defendants Odion, Hines, and Rodriguez are not entitled to summary judgment on Plaintiff's claim that they be held liable for failing to stop Wood, Jackson, and Funderburk's excessive force.

### iii.     Qualified Immunity (Correctional Defendants)

The Correctional Defendants also move for summary judgment, arguing that they are entitled to qualified immunity. However, Defendants' assertion of qualified immunity does not currently provide a basis for judgment as a matter of law. Qualified immunity affords a government official protection from suits for monetary damages when the official has acted in good faith. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This brand of immunity applies to "gray areas, where the law is unsettled or murky," rather than situations where the government actors were "plainly incompetent or . . . knowingly violate[d] the law." *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013) (quoting *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir. 2001)).

In ruling on a defense of qualified immunity, a court must (1) identify "the specific right allegedly violated," (2) determine "whether at the time of the alleged violation the right was clearly established," and (3) if so, then decide "whether a reasonable person in the officer's position would have known that doing what he did would violate that right." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). The first two criteria are pure questions of law to be resolved by the court. *See id.* The third criterion, which requires an evaluation of the objective reasonableness of the conduct in question, may necessitate the resolution of disputed factual issues surrounding the conduct. *See id.* For example, "[i]n instances where there is a material dispute over what the defendant did, and under the plaintiff's version of the events the defendant would have, but under the defendant's version of events he would not have, violated clearly established law, it may be that the qualified immunity question cannot be resolved" without weighing the evidence at trial. *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995). This case presents that situation.

It is a clearly established constitutional right that a pretrial detainee not be subjected to willful, wanton, and outrageous punishment in the form of being kicked, stomped on, and punched. *See Sawyer v. Asbury*, 537 F. App'x 283, 288 (4th Cir. 2013); *Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 669 (D. Md. 2003), *aff'd sub nom. Simms v. Bruce*, 104 F. App'x 853 (4th Cir. 2004). Plaintiff supports her allegation that Wood, Jackson, and Funderburk beat Mr. Shields with record evidence. To credit only Defendants' alternative version of events— good-faith use of force to maintain or restore discipline—would be to disregard Plaintiff's evidence to the contrary. But at the summary judgment stage, the Court must view the facts in the light most favorable to the non-moving party. As such, the Court cannot yet conclude that Defendants are entitled to qualified immunity.

### iv. Deliberate Indifference (All Defendants)

Plaintiff also alleges that the Defendants violated Mr. Shields's right to be free from "unnecessary and wanton infliction of pain" through deliberate indifference to his serious medical needs. The Supreme Court has made clear that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (internal citations omitted).

 "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Burton*, 896 F.2d 848, 851 (4th Cir. 1990).  A non-medical-provider prison official must have both known of a serious risk of harm and recognized that his or her actions were insufficient or "inappropriate in light of that risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). To succeed on a deliberate indifference claim, the medical need "must be both apparent and serious,

and the denial of attention must be both deliberate and without legitimate penological objective." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

"Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Id.* Instead, "deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier,* 896 F.2d at 851. "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." *Id.* at 851-52. A mistake is not sufficient to establish a claim under the Eighth or Fourteenth Amendments because "the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Id.*

It is undisputed that Mr. Shields suffered from a serious medical need, apparent to all Defendants when he became unconscious in the dressing room. And it is also undisputed that the ERT Unit and medical staff were genuinely attempting to resuscitate Mr. Shields. ECF No. 131-9 at 116:19–20; *id.* at 114:15–19, 123:8–11; ECF No. 139-12 at 59:15–25, 60:1–2. However, the record also supports the conclusion that the Corizon Defendants' efforts to save Mr. Shields's life were so grossly incompetent or inadequate as to constitute reckless disregard for the substantial risks facing Mr. Shields. The Corizon Defendants failed to check Mr. Shields's pulse effectively. ECF No. 139-6 at 6; ECF No. 139-5 at 71:9–17. They did not check his airway or to see if his chest was rising. ECF No. 139-5 at 72: 2–3. They did not properly secure the ambu bag. ECF No. 139-5 at 70:8–72:15; ECF No. 139-6 at 6. They did not properly squeeze the ambu bag to ensure proper aeration. ECF No. 139-6 at 5; ECF No. 145-8 at 22:24. And they did not take control of the emergency or remain calm as is necessary. ECF No. 139-4 at 98:2–8.

Based on allegations of this conduct, this Court previously concluded that Plaintiff's pleadings included sufficient factual matter to allege a deliberate indifference claim against the Corizon Defendants. *Shields v. Prince George's Cty.*, No. GJH-15-1736, 2016 WL 4581327, at *6 (D. Md. Sept. 1, 2016). Now, Plaintiff has supported her previous allegations with record evidence, which the Court determines could allow a jury to conclude that "the medical care provided was so cursory as to amount to no treatment at all." *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

The Corizon Defendants point out that Freeman believed the nurses were trying their best to save Mr. Shields's life. ECF No. 131-9 at 123:8–11. However, Freeman's perspective only shows that the Nurses did not intend to breach the standard of care, it does not shed light on whether the care provided was so grossly incompetent as to be equivalent to depriving Mr. Shields of treatment all together. Similarly, that one of Plaintiff's experts indicated she "had no reason to doubt" the appropriateness of the resuscitation attempt, only shows that the Corizon Defendants' competency is in dispute; it does not entitle the Corizon Defendants to summary judgment on the issue given that evidence to the contrary exists in the record. ECF No. 139-12 at 59:15–25, 60:1–2. In sum, a genuine dispute of material fact exists as to whether the Corizon Defendants merely made mistakes with serious consequences or were so grossly incompetent such that they entirely deprived Mr. Shields of medical treatment.

As for Plaintiff's deliberate indifference claim against the Correctional Defendants, Plaintiff concedes that these Defendants worked to address the medical emergency once Mr. Shields was unconscious. ECF No. 150-1 at 24. However, she argues that the ERT members knew when they first encountered Mr. Shields that he "was suffering from a medical condition and that he needed to see members of the medical team for treatment" but they approached this

serious medical need with deliberate indifference. *Id.* at 35. This argument fails though because Plaintiff has not shown that Mr. Shields's medical needs were "both apparent and serious" when the ERT unit first encountered him. *Grayson*, 195 F.3d at 695. Although the ERT members knew that their task was to eventually bring Mr. Shields to the medical unit, there is no evidence that the seriousness of Mr. Shields's health conditions was apparent to them.

Ultimately, the Correctional Defendants are entitled to summary judgment on Plaintiff's claims for deliberate indifference through failure to provide medical care but Plaintiff's same claim against the Corizon Defendants may proceed to trial.

### C. ADA and Rehabilitation Act (Defendants PG County)

The Correctional Defendants also move for summary judgment on Count VII, which alleges that Defendant PG County violated Mr. Shields's rights under Title II of the American with Disabilities Act (ADA) and § 704 of the Rehabilitation Act. Plaintiff maintains that Defendant PG County failed to make reasonable accommodations for Mr. Shields considering his obvious mental disorder.

To establish a claim pursuant to Title II of the ADA, Plaintiff must show: (1) Mr. Shields had a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which they were otherwise qualified; and (3) the exclusion, denial of benefits or discrimination was by reason of the disability. *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); *see also Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999).

To succeed on a ADA claim for the failure to provide medical treatment for a disability, the denial of medical treatment must have occurred because of the disability. *See Miller v. Hinton*, 288 Fed. Appx. 901, 902–03 (4th Cir. 2008) (The alleged denial of medical treatment did

not violate the ADA absent a showing that the inmate was treated in that manner because of his disability); *see also Spencer v. Easter*, 109 Fed. Appx. 571, 573 (4th Cir. 2004) (The failure to provide timely refills is not an ADA violation absent a showing that it was based on the prisoner's disability); *Marshall v. Farrelly*, No. CIV.A. GLR-15-2265, 2015 WL 5165427, at *2 (D. Md. Sept. 2, 2015) ("Where no discrimination is alleged, the ADA is not violated by a prison's failure to attend to the medical needs of its disabled.").

Mr. Shields suffered from schizophrenia, which qualifies as a disability. ECF No. 131-3 at 2; *see* 42 U.S.C. § 12102(1)(A); *Thompson v. Wakefern Food Corp.*, No. CV RDB-15-1240, 2015 WL 9311972, at *6 (D. Md. Dec. 23, 2015)*; see also Olmstead v. L.C.*, 527 U.S. 581 (1999). Plaintiff has also introduced some evidence that county employees knew Mr. Shields suffered from a mental illness. Specifically, Dr. Lawson testified at his deposition, that symptoms of Mr. Shields's mental illness were readily observable. 48-4 at 14:20–15:4. Commenting on footage of Mr. Shields at the Detention Center, Dr. Lawson explained:

> He appears, just by the way he is holding himself and the lack of his ability to follow basic commands, that he appears mentally ill. And by his actions and by his speaking out in -- whether it is another language, which would be something they would need to find out about and try to speak with him correctly and find the right language to speak with him so he understands what they were doing. But it also appears by the singing and by the behavior, that there was mental illness that was present.

*Id.* He also opined that "in general, people that are not following commands and singing loudly in an open area to themselves are probably suffering from some mental illness" because "[t]hat is not normal behavior." *Id.* at 15:17–20. The correctional officer who inventoried Mr. Shields's personal effects observed Mr. Shields singing loudly to himself. ECF No. 148-10 at 3. She also observed his inability to answer basic questions or follow commands when she asked for his medical history, and he "kept singing," rather than answering. *Id.* at 2. Other correctional officers

at intake also observed Mr. Shields singing to himself and speaking indiscernibly. ECF No. 134-14 at 2; ECF No. 134-15 at 2. Based on the way Mr. Shields was "talking just real loud, yelling and stuff," Rodriguez also "knew something was wrong" with Mr. Shields mentally or emotionally, but "didn't know what it was." ECF No. 145-5 at 70:9–11, 72:4–5. Thus, at least some employees observed Mr. Shields engaged in the behaviors that, according to Dr. Lawson, made it apparent that he was suffering from a mental illness.

However, rather than filling out a "psych form," contacting the mental health providers with the medical unit, or expediting Mr. Shields to a "safer environment," ECF No. 145-2 at 37:21–38:3, the correctional officers decided to restrain Mr. Shields and place him in isolation for approximately eight hours, ECF No. 134-15 at 2; ECF No. 148-10 at 2; ECF No. 147-4 at 49:1–12. They did so because he was being disruptive by loudly talking to himself and singing. *Id.* Or, put another way, they moved him to isolation because he was exhibiting symptoms of his mental illness. While in isolation, Mr. Shields did not receive his medications. ECF No. 148-4 at 64:9–18. Thus, a jury could find that because of his disability, Mr. Shields was denied access to his medications and to medical care addressing his mental health episode. As a result, Defendant PG County is not entitled to summary judgment on Plaintiff's ADA claim.

### D.  State Law Claims

The Court now addresses the Correctional Defendants' request for summary judgment on Plaintiff's negligence, wrongful death, assault and battery, and intentional infliction of emotional distress claims.

### i.  Negligence (Defendants Wood, Hines, Funderburk, Jackson, Rodriguez, and Odion)

The Correctional Defendants also seek summary judgment on Count XI—Plaintiff's negligence claim. Although the correctional officers enjoy public official immunity for

negligence claims, *see Livesay v. Baltimore*, 384 Md. 1, 12–13 (Md. 2004), they are not immune to suits based on gross negligence, *Cooper v. Rodriguez*, 118 A.3d 829, 854 (Md. 2015).[7] Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." *Id.* at 845. Conduct constituting gross negligence "implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Id.* at 845–46 (internal citation omitted). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Id.* at 846 (quoting *Taylor v. Harford Cty. Dep't of Soc. Servs.*, 862 A.2d 1026, 1034 (Md. 2004)). Here, the facts are not so clear as to permit a conclusion in the Correctional Defendants' favor as a matter of law. The record would support a jury conclusion that ERT members were asked to deliver Mr. Shields to the medical unit but instead subjected him to physical abuse. Given that their goal was to change his clothes so that he could get medical treatment, the decision to ineffectively strike, punch, and kick him, or to tacitly authorize this conduct, "implies a thoughtless disregard of the consequences" (i.e., Mr. Shields's injuries) "without the exertion of any effort to avoid them." *Cooper*, 118 A.3d at 854 (citation omitted). Thus, the Correctional Defendants are not entitled to summary judgment on Plaintiff's gross negligence claim.

---

[7] Plaintiff also contends that the public-official-immunity defense cannot be asserted by the Correctional Defendants because they acted with malice. However, "[m]alice is established by proof that [a defendant] intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure [the plaintiff]." *Kebe v. Brown*, 161 F.Supp.2d 634, 644–45 (D. Md. 2001). And no such proof exists here.

### ii.    Wrongful Death and Survival Action (Correctional Defendants)

The Correctional Defendants request summary judgment on Plaintiff's wrongful death and survival action claims. The Corizon Defendants do not seek summary judgment on these claims.

In Maryland, a wrongful death action "may be maintained against a person whose wrongful act causes the death of another." Md. Code Ann., Cts. & Jud. Proc. § 3-902. A wrongful act is "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." *Id*. § 3-901(e).

Wrongful death actions require the act complained of to be a proximate cause of the harm alleged. *Pittway Corp. v. Collins*, 409 Md. 218, 243 (Md. 2009). To satisfy this requirement, the act must be both (1) a cause-in-fact, and (2) a legally cognizable cause. *Id*. Where "two or more independent negligent acts bring about an injury . . . the substantial factor test" determines whether causation-in-fact exists. *Id*. at 244. The substantial factor test asks whether it is "'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id*. (quoting *Reed v. Campagnolo*, 332 Md. 226, 240 (Md. 1993). Under this test, courts consider:

(a)  the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
(b)  whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and
(c)  lapse of time.

*Warr v. JMGM Group, LLC*, 433 Md. 170, 246 (Md. 2013) (quoting Restatement (Second) of Torts § 433). Furthermore:

> If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

*Certain-Teed Prods. Corp. v. Goslee Roofing & Sheet Metal, Inc.*, 26 Md. App. 452, 470 (Md. Ct. Spec. App. 1975) (quoting Restatement (Second) of Torts § 439)).

Having already established that genuine disputes of material fact exist over whether the Correctional Defendants acted, at the very least, negligently, what remains to be considered is whether their conduct was a substantial factor in Mr. Shields's death. On this question, the record reflects a dispute. Pointing to Mr. Shields's autopsy, the Correctional Defendants assert that Mr. Shields died naturally of Non-Ischemic Cardiomyopathy with schizophrenia and obesity as significant contributing factors. ECF No. 134-23; ECF No. 134-24 at 8:21–9:17, 31:9–13. However, Plaintiff's expert in forensic pathology, Dr. Flomenbaum, says that Mr. Shields did not die from these factors alone. ECF No. 148-7 at 46:10–12. Instead, "the extenuating factors of what happened in the detention center is what caused [Mr. Shields's] heart to stop functioning[.]" *Id.* at 14–16. As Dr. Flomenbaum explains, while Mr. Shields's "heart was significantly pathological" and "he could have had a heart attack almost any time," he had "been living with that heart all along" and "what pushed him over the edge was not purely natural disease"; instead, it was "the way he was treated in that center, which made his heart work above and beyond what it was designed to do." *Id.* at 47:25–48:19. Dr. Lawson, Plaintiff's expert in emergency care, agrees. In his opinion, the Detention Center's failure to provide Mr. Shields with his hypertension medication, along with the stress and physical trauma he experienced because of his encounter with the ERT unit caused Mr. Shields's blood pressure to rise to dangerously high levels and put him at a high risk of heart attack or stroke. ECF No. 148-4 at

64:1–66:9. Therefore, there is a genuine dispute of material fact as to whether the Correctional Defendants caused Mr. Shields's death, and their Motion for Summary Judgment on this claim will be denied.

### iii.    Assault and Battery (Correctional Defendants)

Battery is defined as an intentional and unlawful touching, which is harmful or offensive. *Elias v. Maryland*, 339 Md. 169 (1995). An assault is an attempt to commit a battery. *Cont'l Cas. Co. v. Mirabeile*, 52 Md. App. 387, 398 (1982). Because Rodriguez and Odion never had or threatened physical contact with Mr. Shields once he was in the dressing room, they are entitled to summary judgment on Plaintiffs' assault and battery claims. Further, since the only physical contact Hines had with Plaintiff was objectively reasonable, Plaintiff cannot satisfy the "unlawful touching" element of a battery claim against Hines.  *Williams v. Prince George's Cnty.*, 112 Md. App. 526, 554 (1996) ("when the force used is not excessive," an officer can only be held accountable for a battery where "there is no legal authority or justification" for the conduct). However, Hines may have assaulted Mr. Shields when he threatened to use pepper spray against him. ECF No. 145-8 at 11:55. There is a genuine dispute of material fact about whether Mr. Shields's ongoing screams were in response to this threat. *Id.* Thus, Defendant Hines is not entitled to summary judgment on Plaintiff's assault claim. Further, because the record indicates that Wood, Jackson, and Funderburk may have used unreasonable force without legal justification against Mr. Shields, they are not entitled to summary judgment on Plaintiff's assault and battery claims.

### iv.    Intentional Infliction of Emotional Distress (Correctional Defendants)

To prevail on a claim of an intentional infliction of emotional distress at trial, Plaintiff must present evidence that shows: (1) the conduct was intentional or reckless; (2) the conduct

was extreme and outrageous; and (3) the conduct resulted in severe emotional distress. *Williams*, 112 Md. App. at 555. He must show that a defendant "desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow." *Foor v. Juvenile Services Admin.*, 78 Md. App. 151, 175 (1989).

Here, evidence would support a finding by a trier of fact that the Correctional Defendants conduct was reckless, extreme, and outrageous. The conduct appeared to shock the conscious of witnesses and of Mr. Shields. Witnesses observing the situation with Freeman were yelling "You killed him. You killed him," when Mr. Shields became unconscious, ECF No. 145-4 at 48:16–17, and Freeman remembers saying to them "be quiet before they come kill us." *Id.* at 47:19–20. Further, Mr. Shields was screaming "murder" during the encounter. ECF No. 145-8 at 11:08, 14:18, 17:10. Yet Defendants continued to engage in this conduct, despite the fact that it was "not necessary." ECF No. 147-4 at 30:21–25; *id.* at 103:14–104:5.

However, insufficient evidence exists that the Defendants' conduct resulted in severe emotional distress. To prevail on this last element at trial, Maryland law requires a "plaintiff to show that he suffered a *severely* disabling emotional response to the defendant's conduct." *Harris v. Jones*, 281 Md. 560, 570 (1977) (emphasis in original). The severity of emotional distress is measured by factors including its intensity and duration. *Caldor, Inc. v. Bowden*, 330 Md. 632, 644 (1993); *Moniodis v. Cook*, 64 Md. App. 1, 15 (1985). A plaintiff will prevail if he can prove that his severely disabling emotional response "hindered his ability to carry out his daily activities." *Id.* Mr. Shields died, meaning he was of course hindered from carrying out his

daily activities. However, insufficient evidence shows this result was caused by emotional distress as opposed to physical injuries.

To be sure, evidence exists in the record that Mr. Shields experienced emotional distress while interacting with Defendants because he was yelling "murder," ECF No. 145-8 at 17:10, "no no," *id.* at 17:52, and moaning, *id.* at 18:21, while they "were just beating" him, ECF No. 145-4 at 43:1–4. Further, evidence exists that this stress was intense enough that, according to Dr. Lawson, it may have caused Mr. Shields's blood pressure to rise to dangerously high levels and put him at a high risk of heart attack or stroke. ECF No. 148-4 at 64:1–66:9. But there is no evidence that the emotional distress Mr. Shields suffered caused a long-term severe and disabling psychological condition; instead, the evidence indicates that any emotional stress experienced by Mr. Shields resulted in long-term physical harm (i.e. death) rather than long-term mental anguish.

As a result, the Correctional Defendants are entitled to summary judgment on Plaintiff's Intentional Infliction of Emotional Distress claim.

## IV.    CONCLUSION

For the forgoing reasons, the Corizon Defendants' Motion for Summary Judgment is denied, and the Correctional Defendants' Motion for Summary Judgment is granted in part and denied in part. A separate order shall issue.

Date: <u>August 2, 2019</u>                                    /s<u>                                        </u>
                                                                          GEORGE J. HAZEL
                                                                          United States District Judge